## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DEVON BANK, as the Personal Representative and   )
Independent Administrator of the Estate of   )
DARONE BUSH, deceased,   )
and CHARLENE MOORE, Individually,   )
   )
        Plaintiffs,   )
   )   Hon.: _____
v.   )
   )   No. _____
UNITED STATES OF AMERICA,   )
c/o United States Attorneys' Office   )
John R. Lausch, Jr., United States Attorney   )
Attn: Civil Process Clerk   )
Dirksen Federal Building   )
219 S. Dearborn Street   )
Chicago, IL 60604   )
   )
        and   )
   )
ST. BERNARD HOSPITAL,   )
Registered Agent:   )
Charles Alan Holland   )
326 W. 64th Street   )
Chicago, IL 60621   )
   )
        and   )
   )
JAMIERE SMITH, M.D.,   )
9951 S. Halsted   )
Chicago, IL 60628   )
   )
        and   )
   )
JAMIERE Y. SMITH, M.D., S.C.,   )
Registered Agent:   )
Michael T. Trucco   )
One East Wacker Dr., Third Floor   )
Chicago, IL 60610   )
   )
        Defendants.   )

## COMPLAINT AT LAW

NOW COMES the Plaintiffs, DEVON BANK, Independent Administrator of the Estate of DARONE BUSH, deceased, and CHARLENE MOORE, Individually, by and through their attorneys, BEAM LEGAL TEAM LLC, and complaining of the Defendants, UNITED STATES OF AMERICA, ST. BERNARD HOSPITAL, JAMIERE SMITH, M.D., and JAMIERE Y. SMITH, M.D., S.C., and state as follows:

## GENERAL ALLEGATIONS

1.      DEVON BANK is the Personal Representative and Independent Administrator of the Estate of DARONE BUSH, deceased (hereinafter "Plaintiff"). This Plaintiff is now and was at the time of the events complained of herein a resident of the State of Illinois.

2.      Charlene Moore is the natural mother and Jamal Bush is the natural father of Darone Bush, deceased. James Bush is the natural brother of Darone Bush. This Plaintiff is now and was at the time of the events complained of herein a resident of the State of Illinois.

3.      DEVON BANK was appointed Independent Administrator of the Estate of Darone Bush, deceased, in the Circuit Court of Cook County – Probate Division on December 5, 2017 (Case No.: 2017 P 7276).

4.      On December 5, 2017 an Order Declaring Heirship was entered by the Circuit Court of Cook County Probate Division which declared Charlene Moore, Jamal Bush, and James Bush to be the only heirs of Darone Bush.

5.      Defendant UNITED STATES OF AMERICA (hereinafter "Defendant USA") is named as a Defendant pursuant to the requirements of the Federal Tort Claims Act (FTCA) 28 U.S.C. § 2671, as upon information and belief one or more of its agents, including but not limited to General Hood, M.D., was employed by Aunt Martha's, a Federally Qualified Healthcare Center, as an obstetrician-

gynecologist physician, and was acting within the scope of his employment at all times relevant to this Complaint within the District.

6.     That during the year 2016 and at all times relevant herein Defendant ST. BERNARD HOSPITAL (hereinafter referred to as "Defendant Hospital") was a corporation existing under the laws of the State of Illinois and has its principal place of business within the District.

7.     That during the year 2016 and at all times relevant herein Defendant JAMIERE Y. SMITH, M.D., S.C. (hereinafter "Defendant Smith SC") was a corporation existing under the laws of the State of Illinois and has its principal place of business within the District.

8.     That during the year 2016 and at all times relevant herein Defendant JAMIERE SMITH, M.D. (hereinafter referred to as "Defendant Smith") was a physician licensed to practice in the State of Illinois and was offering to the public obstetrical and gynecological services in or near the County of Cook and within this District.

9.     That during the year 2016 and at all times relevant herein Defendant Smith was retained as an actual, ostensible, and/or apparent agent, servant, and/or employee by Defendant Hospital and/or Defendant Smith SC as an obstetrician-gynecologist physician and was acting within the course and scope of her employment at all times relevant to this Complaint within the District.

10.     That during the year 2016 and at all times relevant herein Defendant General Hood, M.D. was a physician licensed to practice in the State of Illinois and was offering to the public obstetrical and gynecological services in or near the County of Cook and within this District.

11.     That during the year 2016 and at all times relevant herein General Hood, M.D. was retained as an actual, ostensible, and/or apparent agent, servant, and/or employee by Defendant Hospital and/or Aunt Martha's as an obstetrician-gynecologist physician and was acting within the course and scope of his employment at all times relevant to this Complaint within the District.

3

12.     That during the year 2016 and at all times relevant herein Defendant Hospital did retain as its actual, ostensible, and/or apparent agents, servants, and/or employees, various physicians, nurses, and/or other healthcare professionals including but not limited to Defendant Smith, General Hood, M.D., Jerry Mutua, M.D., Biaisha Washington, R.N., Jennifer Jones, R.N., Comfort Nwankwo, R.N., and/or other healthcare professionals, who while acting within the course and scope of their agency, service, and/or employment did care, treat, diagnose, and/or supervise, or undertake to care, treat, diagnose, and/or supervise the care, treatment, and medical condition of the patients Charlene Moore (hereinafter "Ms. Moore") and her son, Darone Bush (hereinafter "Baby Darone"), both *in utero* and thereafter.

13.     That during the year 2016 and at all times relevant herein Defendant USA, by and through its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to General Hood, M.D. and/or other healthcare professionals provided care and treatment to Ms. Moore and Baby Darone including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment while Ms. Moore and Baby Darone were confined at Defendant Hospital for labor and delivery.

14.     That during the year 2016 and at all times relevant herein Defendant Hospital, by and through its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Defendant Smith, General Hood, M.D., Jerry Mutua, M.D., Biaisha Washington, R.N., Jennifer Jones, R.N., Comfort Nwankwo, R.N., and/or other healthcare professionals, provided care and treatment to Ms. Moore and Baby Darone including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment while Ms. Moore and Baby Darone were confined at Defendant Hospital for labor and delivery.

15.     That during the year 2016 and at all times relevant herein Defendant Smith SC, by and through its actual, ostensible, and/or apparent agents, servants, and/or employees including but not

limited to Defendant Smith and/or other healthcare professionals, provided care and treatment to Ms. Moore and Baby Darone including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment while Ms. Moore and Baby Darone were confined at Defendant Hospital for labor and delivery.

16.     The acts of negligence as alleged in this Complaint all took place within the District.

17.     An administrative tort claim was filed with the Department of Health & Human Services (DHHS) on or about November 16, 2017 and has been denied expressly or by inaction thereby exhausting any administrative remedy.

18.     Jurisdiction is conferred upon this Court pursuant to the Federal Tort Claims Act (FTCA) 28 U.S.C. § 1346(b)(1), §1402(b), § 2679(d)(2), and § 1367(a).

19.     That Ms. Moore's prenatal condition, and that of her unborn Baby Darone, on dates including but not limited to prior to October 17, 2016 (the date of admission for labor and delivery) was unremarkable, and that Baby Darone's condition was reassuring throughout that time.

20.     On October 17, 2016, Ms. Moore and Baby Darone, *in utero*, presented to Defendant Hospital. At this time, Ms. Moore was 32 years old, G2P1, at 40 weeks gestation with EDC October 18, 2016, and was admitted for induction of labor with a history of previous cesarean section.

21.     Ms. Moore was admitted to Defendant Hospital at or about 08:15 on October 17, 2016 as a patient under the care and treatment of Defendant Smith, General Hood, M.D., Jerry Mutua, M.D., Biaisha Washington, R.N., Jennifer Jones, R.N., Comfort Nwankwo, R.N., and/or other healthcare professionals at Defendant Hospital.

22.     That Biaisha Washington, R.N. and/or Jennifer Jones, R.N. and/or Comfort Nwankwo, R.N. were the primary nurses charged with providing obstetrical care and treatment to Ms. Moore and Baby Darone from admission at approximately 08:15 on October 17, 2016 until Baby Darone's delivery at or about 19:19 on October 17, 2016.

23. The medical records indicate that the plan was to "admit for induction of labor, Foley placement with Pitocin. Patient understands if fetal strip or maternal complication will proceed to immediate c-section."

24. At or about 09:14 on October 17, 2016 the medical records indicate that Defendant Smith ordered Cervidil to be inserted.

25. Cervidil is a prostaglandin which is contraindicated by the manufacturer for patients who have a history of previous cesarean section, due to the risk for uterine rupture and associated obstetrical complications.

26. At or about 10:29 on October 17, 2016, Jennifer Jones, R.N. charted the presence of a Category I fetal monitor tracing, which is normal and reassuring for fetal wellbeing.

27. At or about 11:02 on October 17, 2016 the medical records indicate that nurse Biaisha Washington, R.N., charted Cervidil had been placed.

28. At or about 11:31 on October 17, 2016 the medical records indicate that a biophysical profile was performed, which indicated an estimated fetal weight of 4044 +/- 606.5 grams and was scored 8/8 with positive fetal movement, tone, respirations, and amniotic fluid volume.

29. At or about 12:57 on October 17, 2016 the medical records indicate electronic fetal heart monitoring (EFHM) was discontinued by nurse Jones, R.N. for the patient to walk.

30. At or about 16:02 on October 17, 2016 the medical records indicate that EFHM was re-initiated and IV hydration was infusing.

31. At or about 16:19 on October 17, 2016 the medical records indicate "patient experiencing couplings. Abdomen palpated, firm to the palm and back of hand. Will continue to monitor to determine contraction pattern."

32. At or about 16:43 on October 17, 2016 nurse Jones, R.N. charted "patient is having 5 contractions within a 10 minute window. Will continue to monitor."

33.     At or about 16:51 on October 17, 2016 the medical records indicate that a vaginal exam was performed by nurse Jones and/or nurse Washington, and the following findings were charted "Dilatation 1.0, effacement 50%, station -2."

34.     At or about 17:30 on October 17, 2016 nurse Jones, R.N. charted uterine contraction frequency every 1-2 minutes; abdomen firm during contraction to the palm and back of hand.

35.     At or about 17:59 on October 17, 2016 electronic fetal monitoring was again discontinued for patient ambulation.

36.     At or about 18:43 on October 17, 2016 the medical records indicate that electronic fetal heart monitoring was again re-administered.

37.     At or about 18:44 on October 17, 2016 the medical records indicate "patient heard yelling, this writer at bedside to assess patient. Patient asking for pain medication."

38.     At or about 18:54 on October 17, 2016 the medical records indicate "Dr. Hood at bedside with portable ultrasound for scan."

39.     A Progress Note by Dr. Hood states in part, "I went to evaluate the patient for intrauterine Foley bulb placement per the request of the Attending, Dr. Smith. At the time I entered the room, the patient had moderate pain and intermittent fetal heart tones that were not tracing appropriately and irregular uterine contraction pattern. The patient requested pain medication; however, I wanted to examine the patient for placement of the Foley bulb prior to giving her pain medication. Upon realizing Cervidil was in place, Cervidil was removed…"

40.     At or about 18:58 on October 17, 2016 the medical records indicate "Dr. Smith called and made aware of pt. Orders given to emergency c-section. Dr. Hood notified of Dr. Smith's orders."

41.     From approximately 18:57 on October 17, 2016 until the EFHM was disconnected at or about 19:06 on October 17, 2016, Baby Darone's heart rate was about 100-110 bpm representing bradycardia and indicative of hypoxia-ischemia.

7

42.     At or about 19:02 on October 17, 2016 the medical records indicate, "Dr. Mutua @ bedside to assess pt, spoke with Dr. Hood about finding faint FHR per BS US. Dr. Mutua gave orders to move for emergency c-section STAT."

43.     As part of the induction of the labor of Ms. Moore for the birth of the Baby Darone, and despite the contraindication of its use, Cervidil was nevertheless placed and used for several hours, resulting in uterine rupture, abruption, and hypoxia-ischemia to the unborn baby Darone Bush.

44.     Baby Darone Bush was born at or about 19:19 on October 17, 2016, weighing 9lb 13oz (4440g).

45.     In his Operative Report Dr. Hood indicates: "This is a 33-year old female G2, P1 and at 40 weeks who was admitted for induction of labor for vaginal trial of labor secondary to a prior cesarean section. The patient was started on Cervidil for labor induction. After several hours of Cervidil, the patient was found to have abnormal fetal heart tracing, severe abdominal pain, and vaginal bleeding…The patient was taken to the operating room and Foley catheter placed…The peritoneum was then entered…There was a large blood clot noticed about 300mL. The placenta presented totally separated from the uterine wall. A hand was reached into the uterus and found that there was no evidence of fetus. A hand was then reached into the lower thoracic upper abdominal area subdiaphragmatically where the head was palpable…The infant was delivered floppy with no muscle tone and the infant was handed to the awaiting nurses…"

46.     The resuscitation Consultation Note authored by Dr. Tiruvury indicates, "Emergency CS for abruptio placenta. No fetal heart tones…I responded immediately myself & nursery nurse noted mother was on OR table…no fetal heart tones returnable. Crash cart opened, laryngoscope and size 3 ETT kept ready, suction ready, epinephrine drawn prior to birth of baby & kept ready. Mother arrested, unresponsive pulse…received epi x3 I am told. Apgar timer switched as soon as baby was born. Baby was born with no heartbeat, no respirations, no reflex response, pale & floppy. Immediately

CPR started,…PPV…face mask, 100% O2. Blood was coming out of nostrils and mouth. Quick oropharyngeal suction done. Intubated [with] 3.0 ETT easily. O2 analyzer changed color. ETT Epi given 3 mL, CPR continued PPV through ETT continued. Pulse ox attached. All times are per Apgar timer. At 8 min 30 sec per Apgar timer heart beat 150. PPV continued through ETT. No respirations. UVC inserted in OR by 12 min 9 sec as per Apgar timer. Gave bolus of 60 mL N.S. (10 mL syringes x 6 syringes). Bolus completed by 14 min per Apgar timer. Bloods given for CBCD, blood cult, venous blood gas. Without waiting for VBG results (which will take some time) I went ahead [with] 6meq Bicarb also as we were ventilating well [with] ETT bag mask…While I was busy [with] umbilical venous line & boluses some gasping respirations noted by nurse & I was told & I saw. UAC tried in OR not successful due to spasm, both sides arteries. Besides sats 100. Cunosurf given brought the baby to SCN attached to vent, 80% O2,…Rt radial ABG 7.30 / 23 / 201 / BE -13.4…"

47. Dr. Tiruvury's Consultation Note further provides that Baby Darone's Apgars were scored as 0 at 1 minute; 0 at 5 minutes; 3 at 8min30sec; 4 at 10 minutes; 5 at 15 minutes.

48. Dr. Tiruvury concluded the following impression in his Consultation Report, "(1) term 4440g LGA male, (2) perinatal asphyxia mostly intrauterine, (3) previous CS, VBAC, Abruptio Placenta. No detectable F.H. tones prior to US, rupture uterus…"

49. Due to the avoidable and preventable iatrogenic abruption and rupture, Charlene Moore had "massive vaginal bleeding, abdominal pain, and status post cardiopulmonary arrest due to severe bleeding," "acute blood loss anemia," and had to be intubated and given blood transfusions.

50. During labor, the records indicate the unborn baby was developing and experiencing acute, well known signs and symptoms of fetal distress, including but not limited to late decelerations, decreased variability and bradycardia, while Charlene Moore was exhibiting well known signs and symptoms of a uterine rupture and abruption caused by the use of Cervidil in a woman with a history of prior cesarean section.

9

51.     Despite the well-known contraindication to the use of Cervidil in a woman who has had a previous cesarean section, the medical providers of Charlene Moore continued the administration of Cervidil for hours until uterine contractions were of such frequency and/or magnitude to cause uterine rupture and abruption.

52.     Following delivery, Baby Darone was transferred to Mt. Sinai Hospital where he underwent 72-hour neuroprotective hypothermia therapy for his acute intrapartum hypoxic ischemic encephalopathy.

53.     Baby Darone was thereafter transferred to University of Illinois Hospital & Health Sciences System (hereinafter "U of I") for further neurological services, wherein he received the following admitting diagnoses: "HIE s/p head cooling, respiratory distress, feeding intolerance, seizures."

54.     At the time of his discharge from U of I on or about December 1, 2016, Baby Darone's active diagnoses included, "HIE s/p head cooling, G-tube, upper airway secretions."

55.     As a direct and proximate result of his intrapartum injuries, Baby Darone was forced to endure nearly 11 months of pain, suffering, loss of a normal life, and extensive medical care and treatment until he ultimately passed away.

56.     As a direct and proximate result of the intrapartum hypoxia-ischemia and resultant injuries (including hypoxic ischemic encephalopathy), Baby Darone tragically passed away on September 2, 2017.

57.     The decision to deliver Darone Bush by emergency cesarean section came too late as Darone Bush suffered a hypoxic-ischemic brain injury during labor and delivery that caused him permanent life altering injuries, extreme pain and suffering, and, eventually, death. Baby Darone continued to suffer from these damages (including but not limited to cerebral palsy as well as mental

and motoric deficits which rendered him unable to conduct normal activities of daily life) for the remainder of his natural life, which tragically ended prematurely due to the negligence described herein.

58.     Darone Bush, now deceased, as well as his heirs, have suffered and will continue to suffer substantial damages due to the negligence outlined herein.

59.     Ms. Moore suffered iatrogenic placental abruption and/or uterine rupture, which required surgical repair, post-operative respiratory failure, and an extended 7-day stay in the hospital before her eventual discharge.

60.     Although Charlene Moore has recovered from the physical injuries she sustained as a result of her mismanaged labor and delivery, she did incur unnecessary and severe pain, suffering, and extraordinary costs as a result of a 7+ day ICU stay. It has also caused her to incur substantial bills and expenses for the care and treatment of her son beginning on his date of birth (October 17, 2016) and continuing for the remainder of his life.

61.     In accordance with the Federal Tort Claims Act, Plaintiffs have provided the Secretary of the Department of Health a Standard Form 95 claim for their injuries and damages and have otherwise complied with the requirements of the Act prior to the institution of this litigation.

### COUNT I:
### Medical Negligence & Wrongful Death – Defendant USA

62.     Plaintiffs re-allege and incorporate herein by reference the above paragraphs of this Complaint as if fully re-stated herein.

63.     That on or about October 17, 2016 and at all times relevant herein, Ms. Moore and Baby Darone were admitted to Defendant Hospital and were within the care, custody, and control of Defendant USA by and through its' various agents including but not limited to General Hood M.D. and/or other healthcare professionals, who were at all times acting within the course and scope of their agency.

64.     That on or about October 17, 2016 and at all times relevant herein, Defendant USA by and through its agents, including but not limited to General Hood M.D. and/or other healthcare professionals, did undertake the care of Ms. Moore and Baby Darone during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

65.     That on or about October 17, 2016 and at all times relevant herein it then and there became the duty of the Defendant USA, by and through its agents, including but not limited to General Hood M.D. and/or other healthcare professionals, to render healthcare services consistent with the medical requirements of the patients Ms. Moore and Baby Darone, and to possess and apply that degree of care, treatment, and skill commonly exercised by other health care professionals in the same or similar circumstances and to avoid harm.

66.     After assuming the care and treatment of Ms. Moore and Baby Darone, Defendant USA, by and through its' agents, including but not limited to General Hood M.D. and/or other healthcare professionals, deviated from the accepted standard of care and was then and there guilty of one or more of the following negligent acts and/or omissions:

   a. Failure to ensure that Charlene Moore received complete, timely, and accurate physical and care assessments;
   b. Failure to ensure that Charlene Moore received necessary and adequate evaluation, monitoring, treatment, and medication, and avoidance of improper medications;
   c. Failure to ensure that Charlene Moore received timely nursing and medical intervention due to significant changes in her condition and the condition of her baby, *in utero*;
   d. Failure to provide, implement, and ensure that a safe and adequate plan of care for Charlene was created and followed, including but not limited to avoidance of the use of Cervidil and performance of a timely delivery;
   e. Failure to be aware of the contraindication of Cervidil usage for labor induction following a prior cesarean section, and given the evidence of excessive uterine activity in the presence of Cervidil, failure to have it removed under the circumstances then and there existing;
   f. Failure to obtain proper informed consent for VBAC, given that the patient was not adequately informed of the risks of the attempted plan of care;
   g. Failure to provide adequate initial evaluation and adequate continued evaluations/monitoring of Charlene Moore's physical condition and any changes thereto;

12

h. Failure to properly and timely notify the attending physician, or any physician, of significant changes in Charlene Moore's physical condition;

i. Failure to recognize and/or understand that significant changes in the fetus that were appearing in the electronic fetal heart monitoring, which demonstrated that Darone Bush, *in utero*, was experiencing non-reassuring changes including but not limited to late decelerations, bradycardia, and decreased variability, and failure to deliver sooner;

j. Failure to recognize excessive uterine activity and/or tachysystole including but not limited to contractions too strong, contractions too close together, and/or contractions without adequate resting time in between, which were caused by improper use of Cervidil and which is known to cause, and did in fact result in, abruption and/or rupture;

k. Failure to carefully avoid the administration of Cervidil in a patient with a history of prior cesarean section;

l. Failure to be aware of and/or communicate to the patient the well-known risks of abruption and rupture created by attempted induced vaginal delivery following a prior cesarean delivery via the use of Cervidil;

m. Failure to timely remove and/or discontinue administration of Cervidil, which continued to have deleterious effects while Darone Bush was *in utero*, and caused late decelerations, decreased variability, bradycardia, and/or other symptoms of inadequate oxygen and/or blood flow;

n. Failure to properly and adequately monitor, assess, and treat for the adverse changes *in utero* such as excessive uterine activity, tachysystole, late decelerations, bradycardia, and/or decreased variability, and to deliver the unborn baby at an earlier time;

o. Failure to properly monitor, assess, avoid, and treat for uterine rupture and placental abruption suffered by Charlene Moore and Darone Bush, *in utero*, during induction of labor, and to deliver baby Darone at an earlier time;

p. Failure to accurately and timely identify the estimated size and/or presentation of Darone Bush, which would have likely led to performance of an earlier delivery;

q. Failure to perform, obtain, and/or document accurate ultrasound results and measurements, which would have likely led to performance of an earlier delivery;

r. Failure to assess the intrapartum fetal status including but not limited to the fetal heart monitor tracing and contraction monitor and changes thereof which were indicative of deterioration of the fetal status including but not limited to consistent with hypoxia and/or ischemia which necessitated interventions to correct and should said interventions fail to improve the condition, failure to deliver earlier;

s. Failure to continuously electronically monitor the fetal heart rate and/or uterine activity during labor, especially given Charlene Moore being a full-term gravida 2, para 1 mother, with Cervidil placed in the vaginal tract for induction of labor, with a history of prior cesarean section, given the risk of and evidence of tachysystole and/or excessive uterine activity, and carrying a baby estimated to weigh over 4,000 grams in a malpresentation;

t. Failure to monitor and record the fetal heart rate and/or uterine activity throughout labor which was, for large periods of time prior to delivery, uninterpretable and/or unreadable;

u. Failure to timely perform delivery via cesarean section;

v. Failure to create and/or retain proper medical and/or nursing documentation including but not limited to progress notes, physician notes, nursing notes, flowsheet notes, vital signs, labor assessments, fetal heart rate assessments, uterine assessments, patient assessments, etc.;

w. Failure to adequately inform and/or perform a Cesarean section delivery in order to avoid intrapartum hypoxic ischemic neurologic injury;

x. Failure to properly manage Charlene Moore's labor, including but not limited to the improper use of Cervidil and the failure to perform earlier delivery via cesarean section;

y. Failure to timely perform delivery via cesarean section, which would have prevented injury to baby Darone Bush;

z. Failure to perform intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene earlier;

aa. Any other breaches of the standard of care revealed during discovery in this matter;

67.     That reasonably prudent healthcare providers under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

68.     That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Baby Darone did sustain serious and permanent injuries including but not limited to Hypoxic Ischemic Encephalopathy, severe brain injuries, mental and motoric deficits, and eventually death.

69.     Ms. Moore suffered iatrogenic placental abruption and/or uterine rupture, which required surgical repair, post-operative respiratory failure, and extensive pain and suffering during her extended 7-day stay in the hospital before her eventual discharge.

70.     That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Charlene Moore has suffered great pain, suffering, and medical expenses for the personal injuries that she suffered.

71.     That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush suffered great pain, suffering, disability, and will in the future continue to endure such pain, psychological neurological, and/or emotional injuries, and have incurred large medical expenses—which Plaintiffs claim compensation herein.

14

72.     That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense for which the Plaintiffs claim compensation herein.

73.     That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have incurred medical and other expenses for the extraordinary needs of Baby Darone for which the Plaintiffs claim compensation herein.

74.     At the time of his death, Baby Darone left surviving as his heirs and next of kin, his mother, Charlene Moore, and his father, Jamal Bush, and his brother, James Bush, who have been and forever will be deprived of his care, services, support, and society, and have been caused to suffer emotional pain, mental anguish, and substantial economic losses both in the past and in the future for which the Plaintiffs claim compensation herein.

75.     That Devon Bank, Personal Representative and Independent Administrator of the Estate of Darone Bush, deceased, is entitled to assert this cause of action for wrongful death against Defendant USA pursuant to 740 ILCS 180/2.1 for the damages incurred by Darone Bush, Charlene Moore, Jamal Bush, and James Bush.

76.     That Devon Bank, Personal Representative and Independent Administrator of the Estate of Darone Bush, deceased, is entitled to assert Darone Bush's cause of action for medical negligence against Defendant USA pursuant to 755 ILCS 5/27-6 entitled "Actions which Survive."

77.     Plaintiffs have attached hereto the Affidavit of their attorney, pursuant to the provisions of 735 ILCS 5/2-622(a)(2), verifying that this action has not previously been voluntarily dismissed and that the Plaintiffs have been able to obtain a consultation required by 735 ILCS 5/2-622(a)(1) as Exhibit A. The corresponding report of qualified physician is attached hereto as Exhibit B.

15

## COUNT II:

## Medical Negligence and Wrongful Death – Defendant Hospital

78.     Plaintiffs re-allege and incorporate herein by reference the above paragraphs of this Complaint as if fully re-stated herein.

79.     During 2016 and at all times relevant herein Defendant Hospital held its facility out as providing safe and adequate care and treatment to women during labor and delivery including but not limited to through its employees, servants and agents, to provide such care and treatment to the community at large, including Ms. Moore and Baby Darone, prior to and during the delivery of Baby Darone on October 17, 2016.

80.     That on or about October 17, 2016 and at all times relevant herein, Ms. Moore and Baby Darone were admitted to Defendant Hospital and were within the care, custody, and control of Defendant Hospital, by and through its various agents including but not limited to Defendant Smith, General Hood, M.D., Jerry Mutua, M.D., Biaisha Washington, R.N., Jennifer Jones, R.N., Comfort Nwankwo, R.N., and/or other healthcare professionals who were at all times acting within the course and scope of their agency.

81.     That on or about October 17, 2016 and at all times relevant herein, Defendant Hospital, by and through its agents, including but not limited to Defendant Smith, General Hood, M.D., Jerry Mutua, M.D., Biaisha Washington, R.N., Jennifer Jones, R.N., Comfort Nwankwo, R.N., and/or other healthcare professionals, did undertake the care of Ms. Moore and Baby Darone during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

82.     That on or about October 17, 2016 and at all times relevant herein it then and there became the duty of the Defendant Hospital, by and through its agents, including but not limited to Defendant Smith, General Hood, M.D., Jerry Mutua, M.D., Biaisha Washington, R.N., Jennifer Jones, R.N., Comfort Nwankwo, R.N., and/or other healthcare professionals, to render healthcare services

16

consistent with the medical requirements of the patients Ms. Moore and Baby Darone, and to possess and apply that degree of care, treatment, and skill commonly exercised by other health care professionals in the same or similar circumstances and to avoid harm.

83.     After assuming the care and treatment of Ms. Moore and Baby Darone, Defendant Hospital, by and through its agents, including but not limited to Defendant Smith, General Hood, M.D., Jerry Mutua, M.D., Biaisha Washington, R.N., Jennifer Jones, R.N., Comfort Nwankwo, R.N., and/or other healthcare professionals, deviated from the accepted standard of care and was then and there guilty of one or more of the following negligent acts and/or omissions:

    a. Failure to ensure that Charlene Moore received complete, timely, and accurate physical and care assessments;

    b. Failure to ensure that Charlene Moore received necessary and adequate evaluation, monitoring, treatment, and medication, and avoidance of improper medications;

    c. Failure to ensure that Charlene Moore received timely nursing and medical intervention due to significant changes in her condition and the condition of her baby, *in utero*;

    d. Failure to provide, implement, and ensure that a safe and adequate plan of care for Charlene was created and followed, including but not limited to avoidance of the use of Cervidil and performance of a timely delivery;

    e. Failure to be aware of the contraindication of Cervidil usage for labor induction following a prior cesarean section, and given the evidence of excessive uterine activity in the presence of Cervidil, failure to have it removed under the circumstances then and there existing;

    f. Failure to obtain proper informed consent for VBAC given that the patient was not adequately informed of the risks of the attempted plan of care;

    g. Failure to provide adequate initial evaluation and adequate continued evaluations/monitoring of Charlene Moore's physical condition and any changes thereto;

    h. Failure to properly and timely notify the attending physician, or any physician, of significant changes in Charlene Moore's physical condition;

    i. Failure to recognize and/or understand that significant changes in the fetus that were appearing in the electronic fetal heart monitoring, which demonstrated that Darone Bush, *in utero*, was experiencing non-reassuring changes including but not limited to late decelerations, bradycardia, and decreased variability, and failure to deliver sooner;

    j. Failure to recognize excessive uterine activity and/or tachysystole including but not limited to contractions too strong, contractions too close together, and/or contractions without adequate resting time in between, which were caused by improper use of Cervidil and which is known to cause, and did in fact result in, abruption and/or rupture;

k.  Failure to carefully avoid the administration of Cervidil in a patient with a history of prior cesarean section;

l.  Failure to be aware of and/or communicate to the patient the well-known risks of abruption and rupture created by attempted induced vaginal delivery following a prior cesarean delivery via the use of Cervidil;

m.  Failure to timely remove and/or discontinue administration of Cervidil, which continued to have deleterious effects while Darone Bush was *in utero*, and caused late decelerations, decreased variability, bradycardia, and other symptoms of inadequate oxygen and/or blood flow;

n.  Failure to properly and adequately monitor, assess, and treat for the adverse changes *in utero* such as excessive uterine activity, tachysystole, late decelerations, bradycardia, and/or decreased variability, and to deliver the unborn baby at an earlier time;

o.  Failure to properly monitor, assess, avoid, and treat for uterine rupture and placental abruption suffered by Charlene Moore and Darone Bush, *in utero*, during induction of labor, and to deliver baby Darone at an earlier time;

p.  Failure to accurately and timely identify the estimated size and/or presentation of Darone Bush, which would have likely led to performance of an earlier delivery;

q.  Failure to perform, obtain, and/or document accurate ultrasound results and measurements, which would have likely led to performance of an earlier delivery;

r.  Failure to assess the intrapartum fetal status including but not limited to the fetal heart monitor tracing and contraction monitor and changes thereof which were indicative of deterioration of the fetal status including but not limited to consistent with hypoxia and/or ischemia which necessitated interventions to correct and should said interventions fail to improve the condition, failure to deliver earlier;

s.  Failure to continuously electronically monitor the fetal heart rate and/or uterine activity during labor, especially given Charlene Moore being a full-term gravida 2, para 1 mother, with Cervidil placed in the vaginal tract for induction of labor, with a history of prior cesarean section, given the risk of and evidence of tachysystole and/or excessive uterine activity, and carrying a baby estimated to weigh over 4,000 grams in a malpresentation;

t.  Failure to monitor and record the fetal heart rate and/or uterine activity throughout labor which was, for large periods of time prior to delivery, uninterpretable and/or unreadable;

u.  Failure to refuse physician orders which were unreasonably dangerous and/or unsafe to the patients;

v.  Failure to timely perform delivery via cesarean section;

w.  Failure to create and/or retain proper medical and/or nursing documentation including but not limited to progress notes, physician notes, nursing notes, flowsheet notes, vital signs, labor assessments, fetal heart rate assessments, uterine assessments, patient assessments, etc.;

x.  Failure on the part of the agents, servants, and/or employees of The Hospital, including nurses, to advocate for changes of the plan of care, including earlier delivery via cesarean section;

y.  Failure to adequately inform and/or perform a Cesarean section delivery in order to avoid intrapartum hypoxic ischemic neurologic injury;

z.  Failure to properly manage Charlene Moore's labor, including but not limited to the improper use of Cervidil and the failure to perform earlier delivery via cesarean section;

aa. Failure to timely perform delivery via cesarean section, which would have prevented injury to baby Darone Bush;

bb. Failure to perform intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene earlier;

cc. Failure to utilize the chain of command when notification of concerns were not immediately responded to; in other words, the health care provider(s) should have called for and obtained physician(s) to treat the patients, prepare for timely surgery, and expeditiously deliver the baby rather than to allow the baby to continue the dangerous plan of care at a time the health care provider(s) knew or should have known that to fail to intervene with earlier delivery would substantially increase the risk of harm to the baby;

dd. Failure to retain a full, complete, and legible copy of the medical records;

ee. Failure to hire and/or credential only competent and qualified providers, including physicians and nurses, with the adequate training, education, and experience to manage intrapartum and obstetrical patients and/or failure to fire and/or remove/ de-credential incompetent and/or unqualified providers, including physicians and nurses, such that the incompetent and/or unqualified providers could not cause patients harm;

ff. Failure to provide an adequate number of staff and failure to properly train staff to provide for the needs of Charlene Moore;

gg. Failure to promulgate, implement, and maintain reasonable and appropriate policies and procedures;

hh. Failure to comply with JCAHO (Joint Commission on the Accreditation of Healthcare Organizations);

ii. Any other breaches of the standard of care revealed during discovery in this matter;

84.     That reasonably prudent healthcare providers under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

85.     That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Baby Darone did sustain serious and permanent injuries including but not limited to Hypoxic Ischemic Encephalopathy, severe brain injuries, mental and motoric deficits, and eventually death.

86.     Ms. Moore suffered iatrogenic placental abruption and/or uterine rupture, which required surgical repair, post-operative respiratory failure, and extensive pain and suffering during her extended 7-day stay in the hospital before her eventual discharge.

87. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Charlene Moore has suffered great pain, suffering, and medical expenses for the personal injuries that she suffered.

88. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have suffered great pain, suffering, disability, and will in the future continue to endure such pain, psychological, neurological, and/or emotional injuries, and have incurred large medical expenses for which the Plaintiffs claim compensation herein.

89. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense for which the Plaintiffs claim compensation herein.

90. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have incurred medical and other expenses for the extraordinary needs of Baby Darone for which the Plaintiffs claim compensation herein.

91. At the time of his death, Baby Darone left surviving as his heirs and next of kin, his mother, Charlene Moore, and his father, Jamal Bush, and his brother, James Bush, who have been and forever will be deprived of his care, services, support, and society, and have been caused to suffer emotional pain, mental anguish, and substantial economic losses both in the past and in the future for which the Plaintiffs claim compensation herein.

92. That Devon Bank, Personal Representative and Independent Administrator of the Estate of Darone Bush, deceased, is entitled to assert this cause of action for wrongful death against Defendant

Hospital pursuant to 740 ILCS 180/2.1 for the damages incurred by Darone Bush, Charlene Moore, Jamal Bush, and James Bush.

93.      That Devon Bank, Personal Representative and Independent Administrator of the Estate of Darone Bush, deceased, is entitled to assert Darone Bush's cause of action for medical negligence against Defendant Hospital pursuant to 755 ILCS 5/27-6 entitled "Actions which Survive."

94.      Plaintiffs have attached hereto the Affidavit of their attorney, pursuant to the provisions of 735 ILCS 5/2-622(a)(2), verifying that this action has not previously been voluntarily dismissed and that the Plaintiffs have been able to obtain a consultation required by 735 ILCS 5/2-622(a)(1) as Exhibit A. The corresponding report of qualified physician is attached hereto as Exhibit B.

## COUNT III:
### Medical Negligence and Wrongful Death – Defendant Smith

95.      Plaintiffs re-allege and incorporate herein by reference the above paragraphs of this Complaint as if fully re-stated herein.

96.      That on or about October 17, 2016 and at all times relevant herein, Ms. Moore and Baby Darone were admitted to Defendant Hospital and were within the care, custody, and control of Defendant Smith, individually.

97.      That on or about October 17, 2016 and at all times relevant herein, Defendant Smith, individually, did undertake the care of Ms. Moore and Baby Darone during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

98.      That on or about October 17, 2016 and at all times relevant herein it then and there became the duty of the Defendant Smith, individually, to render healthcare services consistent with the medical requirements of the patients Ms. Moore and Baby Darone, and to possess and apply that degree of care, treatment, and skill commonly exercised by other health care professionals in the same or similar circumstances and to avoid harm.

21

99.    After assuming the care and treatment of Ms. Moore and Baby Darone, Defendant Smith, individually, deviated from the accepted standard of care and was then and there guilty of one or more of the following negligent acts and/or omissions:

    a.    Failure to ensure that Charlene Moore received complete, timely, and accurate physical and care assessments;

    b.    Failure to ensure that Charlene Moore received necessary and adequate evaluation, monitoring, treatment, and medication, and avoidance of improper medications;

    c.    Failure to ensure that Charlene Moore received timely nursing and medical intervention due to significant changes in her condition and the condition of her baby, *in utero*;

    d.    Failure to provide, implement, and ensure that a safe and adequate plan of care for Charlene was created and followed, including but not limited to avoidance of the use of Cervidil and performance of a timely delivery;

    e.    Failure to be aware of the contraindication of Cervidil usage for labor induction following a prior cesarean section, and given the evidence of excessive uterine activity in the presence of Cervidil, failure to have it removed under the circumstances then and there existing;

    f.    Failure to obtain proper informed consent for VBAC, given that the patient was not adequately informed of the risks of the attempted plan of care;

    g.    Failure to provide adequate initial evaluation and adequate continued evaluations/monitoring of Charlene Moore's physical condition and any changes thereto;

    h.    Failure to properly and timely notify the attending physician, or any physician, of significant changes in Charlene Moore's physical condition;

    i.    Failure to recognize and/or understand that significant changes in the fetus that were appearing in the electronic fetal heart monitoring, which demonstrated that Darone Bush, *in utero*, was experiencing non-reassuring changes including but not limited to late decelerations, bradycardia, and decreased variability, and failure to deliver sooner;

    j.    Failure to recognize excessive uterine activity and/or tachysystole including but not limited to contractions too strong, contractions too close together, and/or contractions without adequate resting time in between, which were caused by improper use of Cervidil and which is known to cause, and did in fact result in, abruption and/or rupture;

    k.    Failure to carefully avoid the administration of Cervidil in a patient with a history of prior cesarean section;

    l.    Failure to be aware of and/or communicate to the patient the well-known risks of abruption and rupture created by attempted induced vaginal delivery following a prior cesarean delivery via the use of Cervidil;

    m.    Failure to timely remove and/or discontinue administration of Cervidil, which continued to have deleterious effects while Darone Bush was *in utero*, and caused late decelerations, decreased variability, bradycardia, and/or other symptoms of inadequate oxygen and/or blood flow;

    n.    Failure to properly and adequately monitor, assess, and treat for the adverse changes *in utero* such as excessive uterine activity, tachysystole, late decelerations,

bradycardia, and/or decreased variability, and to deliver the unborn baby at an earlier time;

o. Failure to properly monitor, assess, avoid, and treat for uterine rupture and placental abruption suffered by Charlene Moore and Darone Bush, *in utero*, during induction of labor, and to deliver baby Darone at an earlier time;

p. Failure to accurately and timely identify the estimated size and/or presentation of Darone Bush, which would have likely led to performance of an earlier delivery;

q. Failure to perform, obtain, and/or document accurate ultrasound results and measurements, which would have likely led to performance of an earlier delivery;

r. Failure to assess the intrapartum fetal status including but not limited to the fetal heart monitor tracing and contraction monitor and changes thereof which were indicative of deterioration of the fetal status including but not limited to consistent with hypoxia and/or ischemia which necessitated interventions to correct and should said interventions fail to improve the condition, failure to deliver earlier;

s. Failure to continuously electronically monitor the fetal heart rate and/or uterine activity during labor, especially given Charlene Moore being a full-term gravida 2, para 1 mother, with Cervidil placed in the vaginal tract for induction of labor, with a history of prior cesarean section, given the risk of and evidence of tachysystole and/or excessive uterine activity, and carrying a baby estimated to weigh over 4,000 grams in a malpresentation;

t. Failure to monitor and record the fetal heart rate and/or uterine activity throughout labor which was, for large periods of time prior to delivery, uninterpretable and/or unreadable;

u. Failure to timely perform delivery via cesarean section;

v. Failure to create and/or retain proper medical and/or nursing documentation including but not limited to progress notes, physician notes, nursing notes, flowsheet notes, vital signs, labor assessments, fetal heart rate assessments, uterine assessments, patient assessments, etc.;

w. Failure to adequately inform and/or perform a Cesarean section delivery in order to avoid intrapartum hypoxic ischemic neurologic injury;

x. Failure to properly manage Charlene Moore's labor, including but not limited to the improper use of Cervidil and the failure to perform earlier delivery via cesarean section;

y. Failure to timely perform delivery via cesarean section, which would have prevented injury to baby Darone Bush;

z. Failure to perform intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene earlier;

aa. Any other breaches of the standard of care revealed during discovery in this matter;

100. That reasonably prudent healthcare providers under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

101. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Baby Darone did sustain serious and permanent injuries including but not limited to Hypoxic Ischemic Encephalopathy, severe brain injuries, mental and motoric deficits, and eventually death.

102. Ms. Moore suffered iatrogenic placental abruption and/or uterine rupture, which required surgical repair, post-operative respiratory failure, and extensive pain and suffering during her extended 7-day stay in the hospital before her eventual discharge.

103. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Charlene Moore has suffered great pain, suffering, and medical expenses for the personal injuries that she suffered.

104. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have suffered great pain, suffering, disability, and will in the future continue to endure such pain, psychological, neurological, and/or emotional injuries, and have incurred large medical expenses for which the Plaintiffs claim compensation herein.

105. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have sustained other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense for which the Plaintiffs claim compensation herein.

106. That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have incurred medical and other expenses for the extraordinary needs of Baby Darone for which the Plaintiffs claim compensation herein.

107. At the time of his death, Baby Darone left surviving as his heirs and next of kin, his mother, Charlene Moore, and his father, Jamal Bush, and his brother, James Bush, who have been and forever will be deprived of his care, services, support, and society, and have been caused to suffer emotional pain, mental anguish, and substantial economic losses both in the past and in the future for which the Plaintiffs claim compensation herein.

108.     That Devon Bank, Personal Representative and Independent Administrator of the Estate of Darone Bush, deceased, is entitled to assert this cause of action for wrongful death against Defendant Smith pursuant to 740 ILCS 180/2.1 for the damages incurred by Charlene Moore, Jamal Bush, and James Bush.

109.     That Devon Bank, Personal Representative and Independent Administrator of the Estate of Darone Bush, deceased, is entitled to assert Darone Bush's cause of action for medical negligence against Defendant Smith pursuant to 755 ILCS 5/27-6 entitled "Actions which Survive."

110.     Plaintiffs have attached hereto the Affidavit of their attorney, pursuant to the provisions of 735 ILCS 5/2-622(a)(2), verifying that this action has not previously been voluntarily dismissed and that the Plaintiffs have been able to obtain a consultation required by 735 ILCS 5/2-622(a)(1) as Exhibit A. The corresponding report of qualified physician is attached hereto as Exhibit B.

## COUNT IV:
## Medical Negligence and Wrongful Death – Defendant Smith SC

111.     Plaintiffs re-allege and incorporates herein by reference the above paragraphs of this Complaint as if fully re-stated herein.

112.     That on or about October 17, 2016 and at all times relevant herein, Ms. Moore and Baby Darone were admitted to Defendant Hospital and were within the care, custody, and control of Defendant Smith SC, by and through Defendant Smith.

113.     That on or about October 17, 2016 and at all times relevant herein, Defendant Smith SC, by and through Defendant Smith, did undertake the care of Ms. Moore and Baby Darone during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

114.     That on or about October 17, 2016 and at all times relevant herein it then and there became the duty of the Defendant Smith SC, by and through Defendant Smith, to render healthcare services consistent with the medical requirements of the patients Ms. Moore and Baby Darone, and to

possess and apply that degree of care, treatment, and skill commonly exercised by other health care professionals in the same or similar circumstances and to avoid harm.

115.     After assuming the care and treatment of Ms. Moore and Baby Darone, Defendant Smith SC, by and through Defendant Smith, deviated from the accepted standard of care and was then and there guilty of one or more of the following negligent acts and/or omissions:

a. Failure to ensure that Charlene Moore received complete, timely, and accurate physical and care assessments;

b. Failure to ensure that Charlene Moore received necessary and adequate evaluation, monitoring, treatment, and medication, and avoidance of improper medications;

c. Failure to ensure that Charlene Moore received timely nursing and medical intervention due to significant changes in her condition and the condition of her baby, *in utero*;

d. Failure to provide, implement, and ensure that a safe and adequate plan of care for Charlene was created and followed, including but not limited to avoidance of the use of Cervidil and performance of a timely delivery;

e. Failure to be aware of the contraindication of Cervidil usage for labor induction following a prior cesarean section, and given the evidence of excessive uterine activity in the presence of Cervidil, failure to have it removed under the circumstances then and there existing;

f. Failure to obtain proper informed consent for VBAC, given that the patient was not adequately informed of the risks of the attempted plan of care;

g. Failure to provide adequate initial evaluation and adequate continued evaluations/monitoring of Charlene Moore's physical condition and any changes thereto;

h. Failure to properly and timely notify the attending physician, or any physician, of significant changes in Charlene Moore's physical condition;

i. Failure to recognize and/or understand that significant changes in the fetus that were appearing in the electronic fetal heart monitoring, which demonstrated that Darone Bush, *in utero*, was experiencing non-reassuring changes including but not limited to late decelerations, bradycardia, and decreased variability, and failure to deliver sooner;

j. Failure to recognize excessive uterine activity and/or tachysystole including but not limited to contractions too strong, contractions too close together, and/or contractions without adequate resting time in between, which were caused by improper use of Cervidil and which is known to cause, and did in fact result in, abruption and/or rupture;

k. Failure to carefully avoid the administration of Cervidil in a patient with a history of prior cesarean section;

l. Failure to be aware of and/or communicate to the patient the well-known risks of abruption and rupture created by attempted induced vaginal delivery following a prior cesarean delivery via the use of Cervidil;

m. Failure to timely remove and/or discontinue administration of Cervidil, which continued to have deleterious effects while Darone Bush was *in utero*, and caused

26

late decelerations, decreased variability, bradycardia, and/or other symptoms of inadequate oxygen and/or blood flow;

n. Failure to properly and adequately monitor, assess, and treat for the adverse changes *in utero* such as excessive uterine activity, tachysystole, late decelerations, bradycardia, and/or decreased variability, and to deliver the unborn baby at an earlier time;

o. Failure to properly monitor, assess, avoid, and treat for uterine rupture and placental abruption suffered by Charlene Moore and Darone Bush, *in utero*, during induction of labor, and to deliver baby Darone at an earlier time;

p. Failure to accurately and timely identify the estimated size and/or presentation of Darone Bush, which would have likely led to performance of an earlier delivery;

q. Failure to perform, obtain, and/or document accurate ultrasound results and measurements, which would have likely led to performance of an earlier delivery;

r. Failure to assess the intrapartum fetal status including but not limited to the fetal heart monitor tracing and contraction monitor and changes thereof which were indicative of deterioration of the fetal status including but not limited to consistent with hypoxia and/or ischemia which necessitated interventions to correct and should said interventions fail to improve the condition, failure to deliver earlier;

s. Failure to continuously electronically monitor the fetal heart rate and/or uterine activity during labor, especially given Charlene Moore being a full-term gravida 2, para 1 mother, with Cervidil placed in the vaginal tract for induction of labor, with a history of prior cesarean section, given the risk of and evidence of tachysystole and/or excessive uterine activity, and carrying a baby estimated to weigh over 4,000 grams in a malpresentation;

t. Failure to monitor and record the fetal heart rate and/or uterine activity throughout labor which was, for large periods of time prior to delivery, uninterpretable and/or unreadable;

u. Failure to timely perform delivery via cesarean section;

v. Failure to create and/or retain proper medical and/or nursing documentation including but not limited to progress notes, physician notes, nursing notes, flowsheet notes, vital signs, labor assessments, fetal heart rate assessments, uterine assessments, patient assessments, etc.;

w. Failure to adequately inform and/or perform a Cesarean section delivery in order to avoid intrapartum hypoxic ischemic neurologic injury;

x. Failure to properly manage Charlene Moore's labor, including but not limited to the improper use of Cervidil and the failure to perform earlier delivery via cesarean section;

y. Failure to timely perform delivery via cesarean section, which would have prevented injury to baby Darone Bush;

z. Failure to perform intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene earlier;

aa. Any other breaches of the standard of care revealed during discovery in this matter;

116. That reasonably prudent healthcare providers under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

117.   That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Baby Darone did sustain serious and permanent injuries including but not limited to Hypoxic Ischemic Encephalopathy, severe brain injuries, mental and motoric deficits, and eventually death.

118.   Ms. Moore suffered iatrogenic placental abruption and/or uterine rupture, which required surgical repair, post-operative respiratory failure, and extensive pain and suffering during her extended 7-day stay in the hospital before her eventual discharge.

119.   That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Charlene Moore has suffered great pain, suffering, and medical expenses for the personal injuries that she suffered.

120.   That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have suffered great pain, suffering, disability, and will in the future continue to endure such pain, psychological, neurological, and/or emotional injuries, and have incurred large medical expenses for which the Plaintiffs claim compensation herein.

121.   That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have sustained other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense for which the Plaintiffs claim compensation herein.

122.   That as a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, Darone Bush, Charlene Moore, Jamal Bush, and James Bush have incurred medical and other expenses for the extraordinary needs of Baby Darone for which the Plaintiffs claim compensation herein.

123.   At the time of his death, Baby Darone left surviving as his heirs and next of kin, his mother, Charlene Moore, and his father, Jamal Bush, and his brother, James Bush, who have been and

forever will be deprived of his care, services, support, and society, and have been caused to suffer emotional pain, mental anguish, and substantial economic losses both in the past and in the future for which the Plaintiffs claim compensation herein.

124.    That Devon Bank, Personal Representative and Independent Administrator of the Estate of Darone Bush, deceased, is entitled to assert this cause of action for wrongful death against Defendant Smith SC pursuant to 740 ILCS 180/2.1 for the damages incurred by Charlene Moore, Jamal Bush, and James Bush.

125.    That Devon Bank, Personal Representative and Independent Administrator of the Estate of Darone Bush, deceased, is entitled to assert Darone Bush's cause of action for medical negligence against Defendant Smith SC pursuant to 755 ILCS 5/27-6 entitled "Actions which Survive."

126.    Plaintiffs have attached hereto the Affidavit of their attorney, pursuant to the provisions of 735 ILCS 5/2-622(a)(2), verifying that this action has not previously been voluntarily dismissed and that the Plaintiffs have been able to obtain a consultation required by 735 ILCS 5/2-622(a)(1) as Exhibit A. The corresponding report of qualified physician is attached hereto as Exhibit B.

## COUNT V:
### Family Expense Act – All Defendants

127.    Plaintiffs re-allege and incorporates herein by reference the above paragraphs of this Complaint as if fully re-stated herein.

128.    That as a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of the Defendant USA and/or Defendant Hospital and/or Defendant Smith, and/or Defendant Smith SC, Charlene Moore and/or Jamal Bush and/or Darone Bush have incurred expenses in the form of medical bills to care for and treat Baby Darone from October 17, 2016 up to and including his death on September 2, 2017.

WHEREFORE, Plaintiffs demand a Jury Trial for those counts of the Complaint that a jury trial is permitted and demand judgment against the Defendants in an amount to be proven at trial, pre and post judgment interest, costs and attorney's fees and such other relief as the Court deems just and proper.

Dated: July 11, 2018

> DEVON BANK, as the Independent
> Administrator of the Estate of DARONE
> BUSH, deceased, and CHARLENE MOORE,
> Individually,
> Plaintiffs
>
> By counsel,
>
> _____
> Jack Beam, Esq. (6285383)
> Matthew M. Patterson, Esq. (6316641)
> Ryan P. Timoney, Esq. (6324756)
> **BEAM LEGAL TEAM, LLC**
> 954 W. Washington Blvd., Suite 215
> Chicago, IL 60607
> Phone: (312) 733-0930
> Fax: (312) 733-0921
> jbeam@beamlegalteam.com
> mpatterson@beamlegalteam.com
> rtimoney@beamlegalteam.com
> _Attorneys for Plaintiffs_

## JURY DEMAND

Plaintiff, DEVON BANK, as the Independent Administrator of the Estate of DARONE BUSH,

deceased, hereby demands a trial by jury as to all claims asserted against Defendant Smith, Defendant

Smith SC, and Defendant Hospital.

Dated: July 11, 2018

DEVON BANK, as the Independent
Administrator of the Estate of DARONE
BUSH, deceased, and CHARLENE MOORE,
Individually,
Plaintiffs

By counsel,

Jack Beam, Esq. (6285383)
Matthew M. Patterson, Esq. (6316641)
Ryan P. Timoney, Esq. (6324756)
**BEAM LEGAL TEAM, LLC**
954 W. Washington Blvd., Suite 215
Chicago, IL 60607
Phone: (312) 733-0930
Fax: (312) 733-0921
jbeam@beamlegalteam.com
mpatterson@beamlegalteam.com
rtimoney@beamlegalteam.com
*Attorneys for Plaintiffs*